Johnny Lee WADE, Jr. Appellant,

v.

The STATE of Texas, Appellee.

No. B14–81–542–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 18, 1982.

Ronald G. Mock, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Houston, for appellee.

Before PAUL PRESSLER, MURPHY and SAM ROBERTSON, JJ.

SAM ROBERTSON, Justice.

In the case before us, appellant was convicted of murder and sentenced to twenty years imprisonment. Four grounds of error are brought on appeal. The first three complain of insufficient evidence to find intent, knowledge, and voluntariness. The fourth ground urges error in the court's failure to submit a jury charge on aggravated assault.

Briefly, the facts are as follows. On the night of August 12, 1980, appellant came home from work and, stating he was "throwing up the devil," vomited. Thereafter, he fought with his wife, grabbed her throat, and choked her. The next morning, when informed by his children that his wife was in the hallway and was not asleep, he said "Nobody can help her but the good Lord."

In his third ground of error, appellant contends the evidence is insufficient to show that the acts committed by appellant were voluntary.[1] Our Court of Criminal Appeals has stated "the distinction to be drawn in determining if the homicide is criminal is not whether the act is intentional or unintentional, but whether the act is voluntary or involuntary." *Simpkins v. State*, 590 S.W.2d 129 (Tex.Cr.App.1979).

Before a person's conduct can be deemed criminal, our penal code requires that the conduct be voluntary. Tex. Penal Code Ann. § 6.01(a) (Vernon Supp. 1980–1981). This does not eliminate the requirements of a culpable mental state set out in Tex. Penal Code Ann. § 6.02; rather it is a threshold question. The indictment need not allege voluntariness, but "the evidence must show that appellant committed a voluntary act with the requisite mental state." *Simpkins* at 133; *Dockery v. State*, 542 S.W.2d 644, 650 (Tex.Cr.App.1975). We note that in both *Simpkins* and *Dockery* the court addressed questions concerning accidental and negligent homicide; however, neither case limits the construction of Tex. Penal Code Ann. § 6.01(a) to those issues.

The question presented by appellant, then, is a serious one—whether the evidence is sufficient to show his conduct was voluntary. We are not faced with issues of accident or negligence, since appellant was indicted for choking his wife with his hands. Voluntariness, *per se*, is not a jury question. In the absence of evidence that a defendant's conduct was *involuntary*, such conduct is voluntary as a matter of law. Here, however, appellant presented the affirmative defense of insanity. Such a defense, if believed by the jury, would render appellant's conduct involuntary and, thus, we review the relevant law and evidence.

Insanity is an affirmative defense and appellant had the burden of proof thereof by a preponderance of the evidence. Tex. Penal Code Ann. § 8.01; *Graham v. State*, 566 S.W.2d 941, 943 (Tex.Cr.App. 1978). Appellant in the case before us contends that he carried this burden and that his evidence was uncontroverted by the state. We cannot agree. The state is not required to present expert medical testimony. *Graham* at 950. The issue of sanity is a jury question, and jurors may believe or disbelieve experts or lay witnesses as they choose. With these remarks, we turn to the evidence presented.

---

1. Our penal code specifies that one "commits an offense only if he voluntarily engages in conduct, including an act, an omission, or possession." Tex. Penal Code Ann. § 6.01(a) (Vernon Supp. 1980–81).

One of appellant's children testified that he choked and hit his wife after "throwing up the devil" and told another child to "run for Jesus" before going to sleep on the hallway floor beside his dead wife. His wife's sister testified that the following morning when she came over and asked him to call his wife outside, appellant said he couldn't go in the house but that she could. She described him as "acting rather strangely and sort of like he was in a daze or something and nervous like" but when he talked to her he seemed "able to . . . understand the things that were going on around him . . . ." She felt he was "different from the Johnny I know because he usually won't say nothing . . . until I spoke [sic] to him." The police officer who entered the house and found the body of the decedent related that appellant did not answer questions put to him but looked at the officer when asked a question and then looked away. The officer testified that appellant seemed to be in "shock" or a "daze" and that he had seen others react to a traumatic incident in such a manner. Appellant's sister, brother, and mother all testified to his recent religious conversion and said that appellant had stopped drinking and smoking and talked frequently about his religion. Appellant's minister testified he had seen appellant two days before the date of the offense and they had talked about appellant's desire to preach. Appellant seemed rational to the minister at that time. Three of appellant's co-workers testified appellant talked frequently about his new religion and "being saved" and no longer liked to "kid around" as he had before. With the exception of the children and the police officer, all those in contact with appellant prior to the night in question testified that after appellant joined the church he was quieter and constantly occupied by the subject of religion.

Dr. Jerome Brown, the clinical psychologist who examined appellant at the request of the court, testified that he interviewed and administered tests to appellant some six days after he was admitted for observation and put on drug therapy, approximately one month after the date of the offense. At the time of the interview, Dr. Brown found appellant subdued, cooperative, and soft spoken yet felt he was "still susceptible to misinterpreting things around him." He testified that, based on his interview, the results of testing, and his comparison of these with the offense report provided by the police department, it was his opinion that on the night in question appellant was suffering from an acute psychotic episode and was unable to distinguish right from wrong or to conform his behavior to the requirements of the law. He also testified that it is difficult to determine when a person's mental illness began but that the events preceding the night in question are "consistent with [the] onset of a psychotic episode." Such an episode usually lasts several weeks but can be controlled with drug therapy, that is, the condition can be put in remission. Dr. Brown also stated that, in his opinion, appellant was not feigning mental illness.

During cross examination, Dr. Brown was questioned about amnesia and shock. The questions and his answers were as follows:

Q. Now, isn't it true that people that go through some traumatic event, a lot of times they shut that event out of their mind so they don't have to face the reality of it?

A. That's right. They can do that voluntarily or involuntarily, yes.

Later, in response to the state's question about shock, the following exchange occurred:

A. Well, again, acting like you're in a state of shock is one of the many reactions people can have to traumatic events; but that's certainly within expectation or could be considered normal.

Q. But for a person to probably go into the shock itself, they would probably have to know that a traumatic event occurred?

A. Yes.

The Court of Criminal Appeals has said "[u]ltimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury,

not only as to the credibility of the witnesses and weight of the evidence, but also as to the limits of the defense itself." *Graham* at 954. The jury in the case before us heard all of the above testimony and did not find the evidence sufficient to support a verdict of not guilty by reason of insanity. It is not the province of this court to overturn a jury verdict when there is evidence to support their decision. Indeed, we must view the evidence in whatever light most favors the jury's verdict. *Rolhfing v. State*, 612 S.W.2d 598 (Tex.Cr.App.1980). A review of the evidence above convinces us that the jury could have remained unconvinced of appellant's insanity on the date in question. Appellant's third ground of error is overruled.

We consider next appellant's first ground of error which contends the evidence is insufficient to prove *intent*. Appellant was indicted under Tex. Penal Code Ann. § 19.-02(a)(1) and (2) (Vernon 1974).[2] The court's charge to the jury substantially followed the language of both the indictment and the statute, and the jury verdict was a general one which found the defendant "guilty of the offense of murder, as charged in the indictment."

■ At issue first, is whether the state proved the requisite intent. Tex. Penal Code Ann. § 6.03(a) provides that "a person acts intentionally, or with intent, with respect to the *nature* of his conduct *or* to a *result* of his conduct when it is his conscious objective or desire to engage in the conduct *or* cause the result." (emphasis added). More simply, a person must have a "conscious objective or desire" to perform some act or to cause some result. In our opinion, an intent to kill was not required under the second paragraph of the indictment. See *Garcia v. State*, 541 S.W.2d 428 (Tex.Cr. App.1976); *Fazzino v. State*, 531 S.W.2d 818

(Tex.Cr.App.1976). The question is, rather, whether the evidence showed appellant had a conscious objective or desire to engage in conduct which would cause serious bodily injury[3] and committed "an act clearly dangerous to human life" that caused the death of an individual.

The testimony from appellant's children before us indicates that appellant choked his wife and hit her on the jaw with his fist. Appellant's own testimony was as follows:

A. So we was in the bathroom, as I recall, and we started—we just started praying and every thing and I kissed her. Then we started—I kissed her and then, as I can remember, we merely leaned down to the floor for some reason or another and I started—and then I was on top of her and I just started, I just started shaking just like somebody was in my body, shaking and screaming and hollaring. And that's when I snapped, and we just started fighting.

\*  \*  \*  \*  \*  \*

Q. What happened next that you can remember when you and her were fighting?

A. I couldn't stop doing what I was doing. What I was—all I think I can remember when I was fighting is that I didn't have the power to stop doing what I could do. Maybe I was trying to stop fighting or something, I don't know; and then it went a blur.

Q. Now, do you remember—you said ya'll were fighting. Do you remember if you were fighting or both of you were fighting?

A. We was both fighting at that time. I think we both started fighting, at least I started fighting.

Q. You don't remember—you don't know what she was doing?

---

2. Tex. Penal Code Ann. § 19.02(a)(1)(2) reads:
 (a) A person commits an offense if he:
  (1) intentionally or knowingly causes the death of an individual;
  (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual
  . . . .

3. Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(a)(34).

A. I think she was trying to get away or fight or something herself.

Appellant did not remember choking his wife and denied intent to kill her.

We find the above sufficient evidence to support the jury's verdict of guilt. Since they were presented with proper instructions on the offense, on intent, and on appellant's insanity defense, we think they could have found that appellant intended to cause serious bodily injury and committed an act clearly dangerous to his wife's life that resulted in her death. Appellant's first ground of error is overruled.

In his second ground of error, appellant complains that the evidence was insufficient to prove *knowledge* as alleged in the first count of the indictment. Having concluded above that the jury's verdict can be supported under the second count of the indictment, we see no need to consider this ground.

In his fourth ground of error, appellant contends the trial court erred in failing to submit a charge to the jury on aggravated assault, a lesser included offense.

Appellant neither objected to the court's failure to charge the jury on the lesser offense of aggravated assault nor requested such a charge be given. These omissions waive any complaint of such failure on review unless the evidence so clearly raises the issue that a failure to so instruct the jury would amount to a basic denial of a fair and impartial trial. *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App.1974). Our review of the evidence convinces us this issue was not raised so clearly as to require the trial judge to instruct the jury on aggravated assault in the absence of an objection to the charge as given or a request for the above instruction. We observe that, were the issue properly before us for review, a novel question would be presented because it appears aggravated assault cannot be a lesser included offense of murder committed under Section 19.02(a)(2). Appellant's fourth ground of error is overruled.

The judgment is affirmed.